## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

CAROLINE ELDRIDGE,                          :
    Plaintiff,                           :
                                   :      CIVIL ACTION
            v.                      :
                                     :      NO. 10-CV-2143
MUNICIPALITY OF NORRISTOWN,                  :
    Defendant.                           :
                                     :
                                     :
                                     :
                                     :

November _9___, 2011                                      **Anita B. Brody, J.**

### MEMORANDUM

Plaintiff Caroline Eldridge ("Eldridge") has brought suit against Defendant Municipality of Norristown ("Municipality" or "Norristown") for disparate treatment and retaliation  under 42 U.S.C. §§ 1981 and 1983; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 95 *et seq*.[1]  Eldridge also brings a Fourteenth Amendment procedural due process claim under 42 U.S.C. §§ 1981 and 1983. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Norristown has filed a motion for summary judgment.  For the reasons set forth below, I will grant in part and deny in part Norristown's motion.

---

[1]The legal standard at summary judgment is the same under Title VII and the PHRA for disparate treatment and retaliation claims.  Jones v. Sch. Dist. 198 F.3d 403, 409 (3d Cir. 1999). Therefore, in addressing the merits of those claims, this opinion will only reference Title VII because any result reached under it applies equally to Eldridge's disparate treatment and retaliation claims under the PHRA.

I. **Background**[2]

On February 14, 2007, Norristown hired Eldridge, an African-American female, as a

Human Resources ("HR") manager.  Pl.'s Resp. Ex. A.  The Norristown Administrative Code

governed Eldridge's position.  Id.; Forrest Dep. 23:20-24:2.  Eldridge worked as HR manager

until February 18, 2009, when she was terminated by Norristown.  During her first months on the

job, Eldridge was supervised by Police Chief Russell Bono ("Chief Bono").  Bono Dep. 9:19-21,

12:5-8.  Chief Bono had no issues or concerns about Eldridge's performance, received no

complaints about Eldridge, and "got along well" with her over this time period.  Id. at 9:22-

10:14, 12:9-13, 13:15-20, 14:4-12.  In May 2007, Norristown hired David Forrest, a Caucasian

male, as the municipal administrator; thereafter, Eldridge reported to Forrest.  Forrest Dep. 9:18-

24, 19:7-15.  Forrest and Eldridge's relationship progressively deteriorated as a result of several

incidents in the workplace.

**A.  Reported Sexual Harassment and Forrest's January 2008 Memo**

On December 10, 2007, Eldridge reported to Forrest that Charles Picard, a Caucasian

male and Codes Department Supervisor for Norristown, sexually harassed Stephanie Alexander,

a temporary staff employee.  Pl.'s Resp. Ex. B; Eldridge Dep. 101:13-103:1.  In a meeting on

December 11, 2007, Picard and the Municipality's union steward denied the allegations and

claimed that Alexander was the one being disrespectful and insubordinate to other employees.

---

[2] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal quotations omitted).  Where facts are disputed, Eldridge's account of the facts will be taken as true for the purposes of this motion.

2

Def.'s Mot. Summ. J. Ex. P-10.  No action was taken against Picard based on his denial of the allegations.  Forrest Dep. 136:17-137:5.

On January 5, 2008, Forrest wrote a memorandum to Eldridge's personnel file describing her tone in a recent meeting as "curt or rude" and possibly "insubordinate."  Def.'s Mot. Summ. J. Ex. P-5.  The memo then recounted two incidents—one around the time Forrest started with Norristown, the other "perhaps in the early fall of 2007"—in which Eldridge was "combative" and "indignant" toward Forrest.  Id.  He noted that he did not discipline Caroline for these events, but now thought that "[p]erhaps [he] should have done so."  Id.  In concluding, Forrest wrote that he "ha[d] been hoping that [Eldridge's] behavior would turn around," but that he was "[n]ow . . . not so sure."  Id.

**B.  The Counseling Session and Subsequent Appeal**

On April 17, 2008, Forrest held a counseling session with Eldridge to review certain actions that Forrest believed were inappropriate.  According to a memo he wrote on April 18, 2008, Forrest discussed two incidents with Eldridge in this session—one involving her use of an air freshener prior to a meeting ("air freshener incident"), and the other concerning her grabbing the midsection of another employee in front of other employees ("hoagie roll incident").  Def.'s Mot. Summ. J. Ex. D-14.  Additionally, Forrest again voiced his displeasure with several interactions he previously had with Eldridge, noting that she had "raised [her] voice with [him]" and been "borderline insubordinate."  Id.  On May 2, 2008, Eldridge sent a memo to Forrest appealing the April 17 counseling session.  Eldridge stressed three points in the appeal: (1) that the primary reason for the counseling session was the tense working relationship between her and Forrest, (2) that Forrest too had at times displayed inappropriate behavior toward other

3

employees, and (3) that Forrest's treatment of the "hoagie roll" and "air freshener" incidents was untruthful and inaccurate.  See Def.'s Mot. Summ. J. Ex. P-15; Forrest Dep. 169:13-170:20.

   *1. The "Hoagie Roll Incident"*

   The "hoagie roll incident" occurred on February 21, 2008 when several female employees were engaged in a conversation about their weight in the office.  Def.'s Mot. Summ. J. Ex. D-14; Eldridge Dep. 85:21-86:7.  At some point during the conversation, Eldridge approached the group of women and observed everyone "talking and laughing" about one of the co-worker's having "eaten a whole box of Slim Fast bars."  Eldridge Dep. 86:2-7.  She joined in the conversation by acknowledging that "we all could lose a few pounds" and "talking about [her] hoagie roll."  Id. at 86:8-10.  At some point, in the "heat of laughter and talking with female co-workers," Eldridge "reached over and . . . pinched [Rawkins'] midsection."[3]  Id. at 86:12-15. Eldridge did not learn that Rawkins took offense to this gesture until the counseling session on April 17.  Id. at 86:16-19.  In the session, Forrest informed her that Rawkins reported feeling embarrassed by Eldridge's action and that such unsolicited touching is "problematic" and "not consistent with municipal policies."  Def.'s Mot. Summ. J. Ex. D-14.  Soon thereafter, Eldridge called Rawkins into her office and apologized, noting that she "did not mean to offend her." Eldridge Dep. 87:7-88:7.  Eldridge testified that neither she nor Rawkins displayed any acrimony during the meeting.  Id. at 88:8-10.

---

[3]In her April 17 appeal memorandum, Eldridge claimed that she "did not grab any part of [Rawkins'] body," but "simply opened [her] fingers in an act of measuring [her] midriff and [Rawkins' midriff]."  Def.'s Mot. Summ. J. Ex. P-15 at 3.  However, in her deposition, Eldridge stated that she "pinched [Rawkins'] midsection."  Eldridge Dep. 86:12-15.

### 2. The "Air Freshener Incident"

The "air freshener incident" occurred on April 9, 2008 in Norristown's conference room. Def.'s Mot. Summ. J. Ex. D-14. Just prior to a management meeting on that day, Forrest held a separate meeting in the conference room. Eldridge Dep. 89:1-10. Eldridge was not present for this meeting, and did not know who attended it. Id. 89:10-14. In between the meetings, Eldridge walked into the empty conference room and "smelled sewage." Id. 89:8-21, 90:22-91:1. She "immediately tried to open up the window but it was too heavy for [her]." Id. 89:22-24. She then went back to her office, right next to the conference room, and grabbed "a can of neutralizer." Id. 89:24-90:2. When she arrived back in the conference room, Forrest and several other employees were present, "but the meeting had not officially started." Id. 90:3-5. She "began to spray in the vicinity [of the smell] and sat down. [She] was very quiet [and] didn't say anything." Id. 90:5-6. Five of the employees in the room—each a Caucasian man—laughed at Eldridge's action, and two of those men, Chief Bono and Fire Chief Tom O'Donnell, "laughed so hysterically that they turned beet red." Id. 90:8-10, 93:1-94:7. Eldridge "didn't understand why they were laughing so hard." Id. 90:10-11. Forrest did not say anything, Eldridge did not say anything, and "the meeting went its course." Id. 90:11-13; 96:5-10.

After the meeting, Forrest came to Eldridge's office and explained that he, and the men who laughed at Eldridge's spraying, thought that she was making fun of Charlie Picard. Id. at 96:11-16; Def.'s Mot. Summ. J. Ex. D-14. Picard had attended the earlier meeting in the conference room, and he was an employee known around the office for having a body odor problem.

Def.'s Mot. Summ. J. Ex. P-15 at 3; Bono Dep. 17:14-17, 18:4-6.  While Eldridge was aware that Picard possessed a distinct body odor, she was unaware that Picard had been in the conference room prior to her entering it and smelling "sewage."  Eldridge Dep. 96:12-24; Def.'s Mot. Summ. J. Ex. P-15 at 3.  Additionally, she was unaware that Picard had a medical condition, the medication for which caused him to have the odor.  Eldridge Dep. 95:16-96:4, 97:1-5.

   *3. The McCausland Investigation*

   On June 11, 2008, Norristown hired outside counsel to investigate "the allegations of race and gender discrimination that had been filed" by Eldridge against Forrest.  Def.'s Mot. Summ. J. Ex. P-17 (the "McCausland Investigation"); Forrest Dep. 170:5-9.  In her appeal, Eldridge questioned why Forrest had approached her about the "air freshener incident," and not any of the employees who had laughed as a result of her actions.  Def.'s Mot. Summ. J. Ex. P-15 at 3.  During the McCausland Investigation, Eldridge claimed, <u>inter alia</u>, that Forrest's treatment of the "air freshener incident" discriminated against her based on her race and gender.  Def.'s Mot. Summ. J. Ex. P-17 at 4-5.  She has since acknowledged that Forrest spoke with Chief Bono about his reaction to her spraying the air freshener; however, she has testified that at least two of the men who laughed about the event—Fire Chief O'Donnell and Nick Vote—were not questioned about their reactions.  Eldridge Dep. 97:14-98:8.

   On June 24, 2008, while the McCausland Investigation was ongoing, Lieutenant James Hetrick, a Caucasian male, prepared a memorandum criticizing Eldridge's performance and behavior while conducting a recent set of job interviews.  Pl.'s Resp. Ex. C.  In September 2008, the McCausland Investigation ended and a report was issued.   Def.'s Mot. Summ. J. Ex. P-17.

**D.  Devon Vann**

At some point during Eldridge's employment with Norristown, she received a complaint that one of Norristown's employees, Devon Vann, was possibly involved in criminal activity while on the job.  Eldridge Dep. 48:7-24.  Eldridge found this complaint to be a "concern" because Vann "works for the municipality."  Id. 53:3-12.  Eldridge then met with Vann and learned that he had a criminal history as a juvenile in Maryland.  Id. 50:10-14.  After she relayed this information to Forrest, he requested a copy of Vann's criminal record in Maryland.  Id. 51:13-18, 53:16-54:1.  Elridge made the request to Vann, who was unable to retrieve a copy of his record.  Id. 54:5-17.  In her deposition, Eldridge said that she "believe[s]" that at some point later, in an email, she "had made mention that demanding that he retrieve this copy, if he did not, we were going to relieve him from his employment [sic]."  Id. 55:15-23.  She "was concerned" that Norristown was "possibly, possibly violating [Vann's] civil rights" by conditioning his employment in such a manner.[4]  Id. 55:24-56:3.  Norristown ultimately dropped the entire matter after Vann hired an attorney.  Id. 56:22-57:6.

**C.  The Discipline of Charlie Picard**

As noted earlier, Charles Picard, a Caucasian male, was a Codes Department Supervisor for Norristown.  A collective bargaining agreement governed Picard's employment.  Forrest Dep.

---

[4]In her deposition, Eldridge was asked about her understanding as to how that would be violating his civil rights, to which she replied: "Because . . . in the State of Pennsylvania you cannot hold a juvenile record as accountability for employing an individual."  Eldridge Dep. 56:7-11.  When asked if she expressed that point to Forrest at any point prior to Norristown's legal counsel getting involved, she replied, "I don't recall if I did, I don't recall."  Id. 56:12-15.

84:9-17, 91:18-92:11.  Norristown disciplined Picard as a result of his using racially-insensitive language on two separate occasions, and making a harassing phone call.

   *1.  Picard's Use of Racially Insensitive Language*

   In a 2008 meeting with Forrest and several other employees, Picard described the "shoddy" work of others as "nigger rigging."  Picard Dep. 35:17-36:18, 37:11-15; Forrest Dep. 69:1-19, 70:7-15.  Forrest initially responded to Picard's comment in the meeting by saying he was "going to ignore that."  Forrest Dep. 72:17-20.  He then subsequently met with Picard to inform him that "if [he] says things like that, [he] was gonna get fired."  Id. 72:23-73:2.

   Then, in 2009, Picard made a phone call related to his work in which he referred to someone as a "nigger son of a bitch."  Picard Dep. 49:19-50:5; Forrest Dep. 80:11-21.  Picard did not report the incident to Forrest, but, unbeknownst to him, the conversation was on speaker phone.  Picard 56:9-57:4.  Upon learning of the matter from another employee, Forrest met with Picard and suspended him for five days without pay.  Forrest Dep. 82:3-83:14.

   When asked in his deposition why Picard was given a verbal warning and subsequent five-day suspension for these incidents, Forrest responded that the reason was "progressive discipline . . . [because] particularly in a bargaining unit situation, it is . . . prudent to go through the steps so that when ultimately someone is fired, there is a history there."  Id. 83:15-84:8.

   *2.  The Pacelli Investigation*

   On December 17, 2008, Bob Pacelli, an employee with Norristown, filed a complaint with a police officer, explaining that he had been receiving harassing phone calls from an unidentified male.  Def's Mot. Summ. J. Ex. P-6.  Pacelli reported that the calls were coming from the Norristown phone system.  Id.  The contents of the harassing calls led Pacelli to believe

that the unidentified male was calling from the rear section of the municipal building, because from that vantage point the parking lot where Pacelli had received the calls could be seen.  Id. Detective Raymond Emrich was assigned to investigate the matter further ("Pacelli Investigation").  Detective Emrich first met with Pacelli, and in that meeting Pacelli indicated that the individual who made the calls was a soft-spoken male.  Emrich Dep. 20:22-21:1, 22:6-8; 25:5-7.  Pacelli was absolutely certain that the calls were coming from Nick Fote, a Caucasian male and Norristown employee.  Def's Mot. Summ. J. Ex. P-6; Emrich Dep. 21:18-22:5.

Pacelli further explained that he thought the calls were being made because of a contentious meeting he had the previous day with Eldridge.  Emrich Dep. 21:10-14; Def's Mot. Summ. J. Ex. P-6.  Eldridge was not only a friend of Fote's, but she also happened to have an office on the second floor in the rear of the municipal building.  Emrich Dep. 26:16-27:10. Detective Emrich spoke to both Fote and Eldridge about the phone calls.  Id. 24:7-16, 26:16-23; Def's Mot. Summ. J. Ex. P-6.  He also interviewed Devon Vann because he knew Vann was "soft spoken" and he "was advised that at the same time the phone calls were made . . . Vann was cleaning the conference room which is adjacent to [Eldridge's] office and which also has a telephone in it."  Emrich Dep. 27:16-28:4, 28:19-22.  No one from Norristown instructed Detective Emrich to interview these individuals; it was exclusively his decision.  Id. 32:1-14. Detective Emrich did not request a written statement from Eldridge, Fote, or Vann.  Id. 44:3-13. He also testified that at no point did he consider Eldridge a suspect.  Id. 43:24-44:2.  Detective Emrich interviewed no one else from the Municipality.  Id. 28:23-29:2  Because telephone evidence was unable to trace the source of the call, and no one admitted having made the calls, Detective Emrich closed the case.  Def's Mot. Summ. J. Ex. P-6.

9

On March 9, 2009, however, based on another employee's information that Picard had made the phone calls, Detective Emrich met with Picard.  Emrich Dep. 33:4-34:18.  In that meeting, Picard admitted to having made the phone calls.  Id. 35:10-15.  As a result of his admission, Forrest suspended Picard for two weeks, and Detective Emrich issued him a citation for harassment.  Forrest Dep. 94:2-13, 107:6-9; Emrich Dep. 19:7-12.  Norristown then reviewed its harassment policy with Picard and subsequently had him confirm, in writing, that he understood both the policy and that "further violations" of that policy "[might] result in immediate termination."  Def.'s Mot. Summ. J. Ex. P-36; Forrest Dep. 109:10-22.  In his deposition, Forrest emphasized that he was again "following progressive discipline" in making this decision, and that Picard, after this incident, was "really kind of at the end of the road" and being given his "last chance."  Forrest Dep. 109:16-18, 109:24-110:1.

**D.  The Danielle Hodo Interview**

On February 2, 2009, Norristown put out a notice about a job opening for a "Secretary/Clerk floater" in the detective division of the police department.  Def.'s Mot. Summ. J. Ex. P-11; Bono Dep. 19:4-10.  Sharnel Pearson and Danielle Hodo, two African-American females employed by Norristown, applied for the position.  Eldridge Dep. 64:14-17; 66:19-23.  Hodo was a secretary for the codes department seeking to laterally move into the police department.  Id. 62:11-20.  The police department had some serious concerns with Hodo.  She had been a part of "several negative interactions with the police department," including "[o]ne involving a domestic dispute between her and her live-in boyfriend."  Bono Dep. 20:20-21:2.  Her boyfriend had a criminal history.  Id. 21:2-5.  Additionally, there was a bench warrant out for her arrest.  Id. 23:21-24:16; Def.'s Mot. Summ. J. Ex. D-2.  However, on February 10, 2009,

both Pearson and Hodo interviewed for the position.  Bono Dep. 26:21-27:5.  Eldridge, along

with Lieutenant McKeon, Captain Willie Richet, and Millie Laws, secretary to Chief Bono, were

present for the interviews.[5]  Eldridge Dep. 69:4-20.  In an email to Forrest on February 12, 2009,

Eldridge expressed concern regarding some of the questions Lieutenant McKeon posed to Hodo.

Def.'s Mot. Summ. J. Ex. P-13.  The questions, according to Eldridge's email, involved Hodo's

"feelings toward the police department" and "personal experiences with the police," and were

"not consistent with the type of interview [Pearson] received."  Id.; see also Eldridge Dep. 71:1-

7.

    After the interviews, Eldridge recommended Hodo for the job opening because her

communication and computer skills "were exactly what the department needed for that position"

and made her "the best suited applicant out of the two."  Eldridge Dep. 73:14-22; see also Bono

Dep. 26:21-27:11.  At some point subsequent to her recommendation, Eldridge had a meeting

with Forrest and Chief Bono during which they informed her that they thought she was

undermining the municipality by advocating for Hodo without considering the serious concerns

the police department had about Hodo and her relationship with the department.  Eldridge Dep.

73:23-74:6, 74:21-22, 75:18-24.  Eldridge "apologized" and informed them that she based her

recommendation on Hodo's personnel file that included a clean background check, as well as her

test results and interview scores.  Id. 74:22-75:7, 76:1-3.  She testified that, prior to the meeting,

she had no knowledge of Hodo's past interactions with the police department or outstanding

---

[5]Both Chief Bono and Forrest testified that Captain Richet and Millie Laws complained that
Eldridge prevented them from asking any questions during the interview.  Bono Dep. 81:14-82:3;
Forrest Dep. 140:18-141:12.  Eldridge denies ever instructing Captain Richet or Laws to not ask
questions.  Eldridge Dep. 70:21-24.

bench warrant.  Id. 73:3-11, 74:10-13, 76:9-12, 116:8-12.  In the meeting, Forrest and Chief

Bono failed to explain to Eldridge the specific concerns they had with Hodo.  Id. 76:4-8.

Neither Hodo nor Pearson received the clerk position, as Norristown offered it to a later

applicant.  Bono Dep. 31:22-33:1; Eldridge Dep. 66:24-67:6.  In 2010, Forrest and Hodo's

supervisor, Joe Januzelli, decided to promote Hodo from secretary to code enforcement officer in

the codes department.  Forrest Dep. 154:10-155:13.  Forrest made the decision based on the fact

that Januzelli "felt she was the best qualified [for the position]."  Id. 155:14-155:19.

Forrest testified that Eldridge's actions, "in her opinion about Danielle Hodo's candidacy

and pushing her to be employed by the police department, . . . undermin[ed] the police

department [and] the municipality . . . ."  Id. 91:4-14.  For Forrest, this event was the "last straw"

that led to her termination.  Id. 91:14-17.

## D.  Eldridge's Termination

At some point in late January or early February 2009, Forrest met with David Hodo, then

chairman of the Personnel Administration Committee for the Norristown Municipal Council, and

Cathy Lawrence, another member of the Norristown Municipal Council.  Hodo Dep. 29:18-

30:10.  In this meeting, Forrest informed the two council members that he could no longer work

with Eldridge.  Id. 30:13-14.  Forrest failed to provide Mr. Hodo with any documentation of

Elridge's performance issues during this meeting.  Id. 35:12-36:3, 37:4-10.  Mr. Hodo

recommended to Forrest that, if he wanted to fire Eldridge, he needed to have clear

documentation and a formal process prior to doing so.  Id. 31:3-9.

Approximately one week after this meeting, Forrest came before an executive session of

the entire municipal council to inform them of his decision to fire Eldridge.  Forrest Dep. 31:20-

32:1, 32:6-18; Hodo Dep. 57:6-24, 58:15-18.[6]  In making his presentation to the council on

Eldridge, Forrest relied on some documents he had brought with him.  Hodo Dep. 61:17-23.

Specifically, Forrest testified that he referred to some typed notes.  Forrest Dep. 32:19-33:8,

33:12-15.  These typed notes ("P-4 Notes") are a two-page document that lists twenty-three

separate performance or behavioral issues for Eldridge under headings such as "Insubordination,"

"Competence," and "Understanding Her Role."  Forrest Dep. 32:19-33:8, 33:12-15, 35:19-37:8;

Def.'s Mot. Summ. J. Ex. P-4.  Forrest, however, failed to offer any documentation of Eldridge's

alleged problems to council members.  Forrest Dep. 33:9-11; Hodo Dep. 61:23-62:7.  Forrest

later testified that he was "not a hundred percent sure"—but it was "very possible"—he had the

P-4 Notes with him during the council session.  Forrest Dep. 37:20-38:9.  As to when he

prepared the P-4 Notes, Forrest testified that it was "some time prior to [Eldridge's] termination,"

but he "really [did not] know" the exact time.  Id. 39:3-20.

    The specific reasoning Forrest provided to the council for his decision is uncertain.

Forrest testified that he gave "some form of synopsis of the things [listed in the P-4 Notes]."

Forrest Dep. 55:1-11.  Hodo, meanwhile, testified that Forrest mentioned the "hoagie roll

incident," an interaction with Eldridge "blown totally out of proportion" where she accused him

of belittling her, and some of the "things that were detailed" in the McCausland Investigation.

Hodo Dep. 58:19-59:21.  According to Mr. Hodo, Forrest "never brought up" Eldridge's

-------------------------------------------------

[6]The reach and effect of Forrest's "decision" at this time is uncertain.  In his deposition, Forrest
gave statements, both explicit and implicit, indicating that the decision he was informing the
council of at this time was to fire Eldridge.  Forrest Dep. 31:20-32:1, 35:12-37:9.  However, he
later testified that his "decision [regarding Eldridge's employment] was that barring anything that
would come up [in Eldridge's termination meeting] that would dictate otherwise, that we were
going to terminate her."  Id. 40:7-16.

interview or recommendation of Danielle Hodo for the clerk position in the police department. Id. 68:1-7.  Prior to his deposition, Mr. Hodo had "never seen" the P-4 Notes.  Hodo Dep. 62:13-18.

On February 17, 2009, Forrest emailed Eldridge, asking her to attend a meeting in his office at 9:00 a.m. the next morning.  Def.'s Mot. Summ. J. Ex. P-19.  In that meeting, Forrest terminated Eldridge's employment with Norristown.  Forrest Dep. 195:14-22; Bono Dep. 69:16-70:1.  Forrest first presented the reasons why he was considering terminating Eldridge.  Forrest Dep. 195:14-19.  He then offered Eldridge "an opportunity to present her side."  Id. 195:19-20. She declined, and Forrest subsequently fired her.  Id.  195:21-22.

Regarding the specific reasoning presented to Eldridge supporting her termination, Forrest stated in his deposition: "I think I went through a list, a summary list, probably based on one of these exhibits of the concerns I had about her performance."  Forrest Dep. 194:2-7.  He then explained that although he did not have a "firm recollection," he was "likely" referring to the P-4 Notes.  Id. 194:8-195:2.  However, Chief Bono, who was also present at the meeting, testified that Forrest failed to mention any of the issues or events listed in the P-4 Notes during the meeting.  Bono Dep. 71:8-75:20.  If there was any discussion of Eldridge's performance or behavior as a human resources manager, Chief Bono said "it was general in nature."  Id. 75:21-76:10.  Chief Bono also did not remember Forrest referring to any notes, and had "never seen" the P-4 Notes until a week prior to his deposition.  Id. 70:11-12, 71:8-11.  The only document given to Eldridge during the meeting was a severance agreement.  Forrest Dep. 193:22-194:1, 195:3-6; Bono Dep. 70:16-21.

14

On February 26, 2009, eight days after firing Eldridge, Forrest wrote a memo for Eldridge's file, discussing a meeting he recently had with Eldridge on her drafting an extended sick leave policy and personnel manual.  Def.'s Mot. Summ. J. P-20.  In the memo, Forrest described several concerns he had with Eldridge's performance in creating these drafts—calling it a "careless effort"—and with her behavior in the meeting.  Id.  In her deposition, Eldridge testified that Forrest had never expressed any issues directly concerning her performance in creating the drafts, and that David Hodo and Mila Hayes of the municipal council approved her personnel manual draft prior to her departure.  Eldridge Dep. 125:15-126:16, 126:24-127:7.

On May 29, 2009, Eldridge dual-filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging that, in terminating her employment, Norristown discriminated against her based on her race and gender and retaliated against her based on her engaging in a protected activity.  Pl.'s Resp. Ex. G.  The EEOC issued a Notice of Right to Sue on March 30, 2010.  Pl.'s Resp. Ex. H.  On May 10, 2010, within ninety days of receiving her Notice of Right to Sue, Eldridge filed a complaint in this court, asserting claims for disparate treatment (Count I) and retaliation (Count II) under 42 U.S.C. §§ 1981 and 1983, Title VII, and the PHRA.  ECF No. 1.  On February 16, 2011, Eldridge amended her complaint to include a procedural due process claim (Count III) under Sections 1981 and 1983, arguing that Norristown violated her procedural due process rights by not affording her with proper notice or an opportunity to respond prior to terminating her employment.  ECF No. 20.  On March 24, 2011, Norristown filed a motion for summary judgment as to all Eldridge's claims.  ECF No. 22.

## II. Legal Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## III. Discussion

Norristown moves for summary judgment on all three counts of Elridge's amended complaint. It raises several arguments in support of its motion. Specifically, Norristown argues that: (1) the court lacks subject matter jurisdiction over Eldridge's PHRA claims because she

16

failed to exhaust her administrative remedies under the PHRA; (2) Eldridge has failed to

establish that Norristown's reasons for discharging her are pretext for discrimination to support

her disparate treatment claim; (3) Eldridge has failed to establish that her termination has a causal

connection to her engaging in any protected activity to support her retaliation claim; (4) Eldridge

is prohibited from bringing her claims under Section 1981 because Section 1983 is the exclusive

remedy through which she may seek relief against Norristown; and (5) Eldridge cannot establish

that Norristown has municipal liability under § 1983 and that her § 1983 claims fail against

Norristown regardless of municipal liability.  I will address each of these arguments in turn.

## A.  Exhaustion of PHRA Claims

Norristown argues that Eldridge's PHRA claims are not viable because she filed her

initial complaint in this court less than a year after filing her charge of discrimination with the

PHRC and thus failed to exhaust her administrative remedies.  Pursuant to the PHRA, 43 Pa.

Cons. Stat. § 962(c), the PHRC has exclusive jurisdiction over all cases involving a claim of

discrimination for one year so that it may investigate and potentially resolve the claim.  Burgh v.

Borough Council of Montrose, 251 F.3d 465, 471 (3d Cir. 2001) (citing Clay v. Advanced

Computer Applications, Inc., 559 A.2d 917, 920 (Pa. 1989)).  Before seeking judicial remedies, a

plaintiff must exhaust all administrative remedies and comply with all procedural requirements

under PHRA.  Clay, 559 A.2d at 919-20.

Norristown is correct that Eldridge filed her initial complaint, asserting PHRA claims,

less than a year after filing her charge with the PHRC.  On May 29, 2009, Eldridge dual-filed a

charge of discrimination with the PHRC and EEOC.  Less than a year later, on May 10, 2010,

Eldridge filed her initial complaint in this court.

However, courts in the Third Circuit have adopted a more flexible approach to PHRA exhaustion by permitting plaintiffs to maintain PHRA claims if the period of exhaustion expires during the pendency of litigation or if plaintiff files an amended complaint after the period of exhaustion.  See Rosetsky v. Nat'l Bd. of Med. Examiners of U.S., Inc., 350 Fed. Appx. 698, 703 & n.3 (3d Cir. 2009) (noting that a district court may exercise jurisdiction over a prematurely filed PHRA claim by allowing plaintiff to amend her complaint, when the mandatory one-year period had expired during litigation); Schaefer v. Independence Blue Cross, Inc., No. 03-cv-5897, 2005 WL 181896, at **5-6 (E.D. Pa. Jan. 26, 2005) (denying summary judgment on prematurely filed PHRA claim because one-year deadline expired during court proceedings and plaintiff filed an amended complaint after the expiration of the deadline); Violanti v. Emery Worldwide A-CF Co., 847 F.Supp. 1257, 1258 (M.D. Pa. 1994) (holding that premature filing of PHRA claim was curable by the passage of time); see also Wardlaw v. City of Phila., No. 09-cv-3981, 2011 WL 1044936, at **3 & n.45 (E.D. Pa. Mar. 21, 2011) (noting the flexible approach of the Third Circuit to PHRA exhaustion and listing supporting case law).

Norristown fails to acknowledge that Eldridge filed an amended complaint on February 16, 2011, reasserting her PHRA claims and adding a procedural due process claim, and that the period required for PHRA exhaustion expired more than a year ago during the pendency of this litigation.  Furthermore, Norristown has not shown that the PHRC shortened its investigation as a result of Eldridge's filing her complaint.  See Kelly v. U.S. Steel Corp., No. 2:11-cv-00193, 2011 WL 3607458, at **2-3 (W.D. Pa. Aug. 16, 2011) (finding that, even though plaintiff prematurely filed her PHRA action, because the exhaustion period expired during the pendency of the

litigation and defendant did show that the premature filing effected the PHRC's investigation, the PHRA claim was viable).

Therefore, summary judgment on Eldridge's PHRA claims based upon a failure to exhaust administrative remedies is not appropriate.

**B.  Title VII Disparate Treatment**

Count I of Plaintiff's amended complaint asserts a claim for "disparate treatment-pretext" under, underline inter alia, Title VII.  Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or natural origin."  42 U.S.C. § 2000e-2(a)(1).

Title VII disparate treatment claims may be proven by direct or indirect evidence. Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  Here, Eldridge offers indirect evidence of race and gender discrimination in Norristown's decision to terminate her employment.  Thus, her claim must proceed through the three-step burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must establish a prima facie case of discrimination.

In order to establish a prima facie case of disparate treatment under Title VII, a plaintiff must show the following: "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was . . . fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class."  Jones v. Sch. Dist. 198 F.3d 403, 410-11 (3d Cir. 1999).  "If the plaintiff establishes the elements of a prima facie case, the employer must articulate a

19

legitimate, non-discriminatory reason for its employment decision." Smith v. Borough of Wilkinsburg, 147 F.3d 272, 278 (3d Cir. 1998).

The Third Circuit has commented that the employer's burden at this stage is "relatively light," and requires only an articulation of a legitimate reason for the unfavorable employment decision in question. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id.

At the third stage of the McDonnell Douglas analysis, "the burden then reverts to the plaintiff to prove by a preponderance of the evidence that the articulated reason is a pretext." Smith, 147 F.3d at 278. This requires the identification of "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Therefore, regarding the first evidentiary prong, "[t]he plaintiff can discredit the proffered reasons by 'demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons.'" Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir. 2010) (quoting Fuentes, 32 F.3d at 765).

Concerning inconsistency in particular as evidence of pretext, the Third Circuit has explained that "[i]f a plaintiff demonstrates that the reasons given for her termination did not

remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record."  Abramson v. William Paterson Coll. of N. J., 260 F.3d 265, 284 (3d Cir. 2001); see also Smith, 147 F.3d at 281 (holding that a district court should have given a more forceful pretext instruction to the jury when an employer had given different rationales to the EEOC and to the trial court); EEOC v. L.B. Foster Co., 123 F.3d 746, 753-55 (3d Cir. 1997) (finding that EEOC suit was not frivolous in part due to employer's having given unrelated explanations for termination in his deposition and at trial).  In reviewing whether a plaintiff has established pretext, a court must consider "the totality of the evidence," and not "the strength of each individual argument."  Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir. 1997).

In moving for summary judgment, Norristown fails to address whether Eldridge has established her prima facie case, but does offer, albeit without much clarity, several legitimate, non-discriminatory reasons for terminating Eldridge.  Specifically, it asserts that:

> No reasonable juror would infer that a human resources manager would grab the stomach of another individual, humiliate or make fun at the expense of another who has an odor condition or purposely support a candidate for a position where she knows or should know that the individuals' [sic] transfer would not be in the best interest of her employer.

Def.'s Mot. Summ. J. 24.  Presumably, Norristown is referring to the "hoagie roll incident," the "air freshener incident," and Eldridge's recommendation of Danielle Hodo for a clerk position in the police department as the legitimate, non-discriminatory reasons for its decision.  It also cites alleged "legitimate business differences" between Forrest and Eldridge, as another non-

21

discriminatory, legitimate reason for Elridge's firing.  Id.  These reasons suffice to satisfy

Norristown's "relatively light" burden of production.

Eldridge demonstrates that Norristown's reasons are pretextual by emphasizing the

inconsistencies surrounding Norristown's termination of Eldridge.  Specifically, she points to

Forrest's alleged reliance on the P-4 Notes—a document listing twenty-three different

performance or behavioral issues for Eldridge—to support her termination.  Def.'s Mot. Summ.

J. Ex. P-4.  Forrest claims to have relied on the P-4 Notes in discussing Eldridge's termination

with both the municipal council and Eldridge herself.  Forrest Dep. 32:19-33:8, 33:12-15.

Forrest, however, fails to remember when exactly he prepared the P-4 Notes, and the notes do not

indicate a time of creation.  Forrest Dep. 37:20-38:9, 39:3-20; see Def.'s Mot. Summ. J. Ex. P-4.

Additionally, Chief Bono, who was present at Eldridge's termination meeting, testified that

Forrest failed to mention any of the issues or events listed in the P-4 Notes during the meeting.

Bono Dep.71:8-75:20.  If there was any discussion of Eldridge's performance or behavior as a

human resources manager, Chief Bono said "it was general in nature."  Id. 75:21-76:10.

Norristown failed to present the P-4 Notes—or any other document besides a severance

agreement—to Eldridge in her termination meeting, and Chief Bono did not remember Forrest

referring to any notes in the meeting.  Forrest Dep. 193:22-194:1, 195:3-6; Bono Dep. 70:11-12,

70:16-21, 71:8-11.  Neither Chief Bono nor David Hodo, a former council member who

participated in Forrest's meeting before the Municipal Council, had ever seen the P-4 Notes until

this litigation commenced.  Id. 71:8-11; Hodo Dep. 61:23-62:18.

Furthermore, the record reveals several potential weaknesses and contradictions in at least

one of Norristown's proffered reasons for terminating Eldridge—Eldridge's recommendation of

Danielle Hodo for a secretary/clerk position in the detective division of the police department.  In his deposition, Forrest stressed that Eldridge's support of Danielle Hodo was the "last straw" for her employment and undermined the municipality because Hodo had a history of negative interactions with the police, a boyfriend with a criminal history, and an outstanding bench warrant.  Forrest Dep. 91:4-17, 142:15-143:4.  But in the year following Eldridge's recommendation of Hodo—an action Norristown deemed an attempt to undermine the municipality—Forrest promoted Hodo to be a code enforcement officer, on the recommendation of her supervisor, Joe Januzelli.  Forrest Dep. 154:10-155:19.  Eldridge, moreover, denied knowing any of this information until after the interview and her subsequent recommendation of Hodo.  Eldridge Dep. 73:3-11, 74:10-13, 76:9-12, 116:8-12.  Norristown fails to offer any direct evidence to rebut Eldridge's denial.[7]  It is telling that now, for the first time, Norristown asserts that even if Eldridge did not know that recommending Hodo was not in its best interests, her lack of awareness that it was not in their best interests was a legitimate, non-discriminatory reason for its decision to terminate her employment.  See Def.'s Mot. Summ. J. 24 ("No reasonable juror would infer that a human resources manager would . . . purposely support a candidate for a position where she knows *or should know* that the individuals' transfer would not be in the best interest of her employer.") (emphasis added).

---

[7]The only evidence Norristown offers is an email between Forrest and Eldridge, sent seventeen days after Chief Bono first informed Forrest of Hodo's interactions with the police, in which Forrest asks Eldridge to "keep the information I shared with you this morning confidential." Def.'s Mot. Summ. J. Ex. D-1.  No mention is made in the email of Danielle Hodo or any of the events that caused Norristown to think Eldridge's recommendation of Hodo was undermining the municipality.

These points alone raise sufficient suspicions and inconsistencies regarding Norristown's proffered reasons for terminating Eldridge to establish a genuine issue as to whether Norristown's articulated reasons are pretext for gender and race discrimination.[8] See Bray, 110 F.3d at 990 ("An inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility or the employer's treatment of the employee."); Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006) ("[T]he rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales.") (citing Fuentes, 32 F.3d at 764 n.7).  Thus, Norristown's motion for summary judgment as to Eldridge's Title VII and PHRA claims of disparate treatment based on race and gender discrimination is denied.

**C.  Title VII Retaliation**

Eldridge next brings a Title VII claim for retaliation against Norristown as a result of its firing her for engaging in allegedly protected conduct.

---

[8]Alternatively, Eldridge offers evidence to show that race and/or gender discrimination were more likely than not a cause for Norristown's action.  See Fuentes, 32 F.3d at 764 (stating that pretext may be established by "some evidence, direct or circumstantial, from which a factfinder would reasonably . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action").  In support of this argument, she points to Norristown's treatment of Charlie Picard—a Caucasian male employee who was disciplined, but never ultimately fired, as a result of using racially insensitive language on two occasions and making a harassing phone call—compared to its treatment of her.  Pl.'s Resp. 22-23.  Because the record contains sufficient inconsistencies to raise a genuine issue as to the credibility of Norristown's articulated reasons for its decision, I need not address the merits of this argument at this stage of the litigation.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) she suffered an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action.  Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).  "In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."  Id. (citation and internal quotation marks omitted).

Defendant first emphasizes that Eldridge has failed to establish that she was engaged in a protected activity.  Protected activity extends beyond formal complaints filed with the EEOC or the PHRC, and can include "informal protests of discriminatory employment practices, [such as] making complaints to management, writing critical letters to customers, [and] protesting against discrimination by industry or society in general."  Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (citation and internal quotation marks omitted).  However, the Third Circuit has also held that "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII" and that "opposition to an illegal employment practice must identify the employer and the practice—if not specifically, at

least by context."  Id.; see also Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)

(affirming district court's grant of summary judgment on retaliation claim because plaintiff's

letter to her employer's human resources department was not protected activity, as it did not

"explicitly or implicitly" complain about age discrimination).

In support of her Title VII retaliation claim, Eldridge points to her being fired "less than a

week after she complained of civil rights violations against an African American female."  Pl.'s

Resp. 24.  Specifically, Eldridge is referring to the email she sent to Forrest on February 12,

2009, after Danielle Hodo's interview for a secretary/clerk position in the detective division of

the police department.  Def.'s Mot. Summ. J. Ex. P-13.  In that email, she informed Forrest that

"the interview Danielle experienced was not consistent with the type of interview the other

candidate received" and that she was concerned "Danielle's civil liberties were violated."  Id.

Eldridge fails to demonstrate how such activity is protected under Title VII.  Her labeling the

email a discrimination complaint is simply inaccurate, considering that "the other candidate" to

whom she referred in the email is Sharnel Pearson, an African American female.  Eldridge Dep.

66:19-23, 71:1-7.  Because Eldridge's email failed to identify any type of discrimination, but

instead raised a general concern about whether certain personal questions about Hodo's

relationship with the police violated her civil liberties, she has failed to establish the first prong

of her prima facie retaliation case under Title VII. [9]

---

[9]In a separate section of her brief, Eldridge addresses whether Norristown's proffered reasons for
terminating her are pretext for discrimination.  Within this section, Eldridge lists, in bullet-point
form, nineteen separate reasons and events that she contends are sufficient evidence from which
a jury could reasonably infer that Norristown's proffered reasons for firing her are pretext for
discrimination *or retaliation*.  Pl.'s Resp. 20-21.  Eldridge fails to explain which of these reasons
support her Title VII retaliation claim.  Moreover, Eldridge fails to explain, in any way

Therefore, Norristown's motion for summary judgment as to Eldridge's Title VII and PHRA retaliation claims is granted.

## D.  Section 1981 Claims

Eldridge brings her claims of disparate treatment, retaliation, and deprivation of a property interest without due process under 42 U.S.C. § 1981, inter alia.  Norristown correctly points out that the Third Circuit has held that § 1983 is "the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."  McGovern v. City of Phila., 554 F.3d 114, 121 (3d Cir. 2009) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)).  Thus, because no private right of action lies against a state actor under § 1981, Norristown's motion for summary judgment on each of Eldridge's claims is granted to the extent they are brought under § 1981.

## F.  Municipal Liability Under § 1983

Eldridge next asserts her disparate treatment, retaliation, and procedural due process claims under 42 U.S.C. § 1983.

"To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of state law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury."  Elmore v. Cleary, 399 F.3d 279, 381 (3d Cir. 2005).  Although § 1983 can be used to obtain relief from local governments, it does not hold

---

whatsoever, how any of this evidence establishes her prima facie case—specifically, what actions were protected activity, what adverse employment action(s) she suffered as a result, or how the two were causally connected.  Therefore, even if Eldridge is relying on any of these assertions in making her Title VII retaliation claim, she has still failed to satisfy her prima facie burden.

governments vicariously liable for all of their employees' illegal acts.  Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Municipality liability attaches under § 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Monell v. New York City Dept. Of Social Servs., 436 U.S. 658, 694 (1978).

"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citation, alteration, and internal quotation marks omitted).  "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citations omitted).

Norristown moves for summary judgment on Eldridge's § 1983 claims by arguing that Eldridge cannot establish municipal liability because she has failed to point to any official policy or custom which caused her any injury based on a violation of federal or constitutional law; alternatively, they note that, regardless of municipal liability, Eldridge's § 1983 claims against Norristown fail on the merits.  Specifically, Norristown stresses that because "all of [Eldridge's] allegations are directed against her immediate supervisor, David Forrest," and not toward any policy or custom of the Municipality, her § 1983 claims must fail.  Def.'s Mot. Summ. J. 28-29.

The record contains no evidence that Norristown had a policy or custom that resulted in any disparate treatment or retaliation toward Eldridge, or any violation of her right to procedural due process.  The only contention Eldridge raises to Norristown's municipal liability argument is

that Norristown had a "custom of discriminatory conduct."  She supports this contention by

pointing to nineteen different "facts" that allegedly "recount Norristown's pattern of engaging in

discriminatory conduct."  Pl.'s Resp. 21-23, 25.  Many of these "facts," though, are actually

allegations that are either unfounded or immaterial to the question of whether a pattern of

discriminatory conduct existed.  More importantly, as Norristown emphasizes, the only

Norristown employee implicated within the material allegations is Forrest.[10]  Regardless of the

veracity of these allegations, Eldridge cannot establish that this course of conduct "is so well-

settled and permanent as to constitute law."

It is true, as the Supreme Court and Third Circuit have made clear, that "that an official

with policymaking authority can create official policy, even by rendering a single decision."

McGreevy v. Stroup, 413 F.3d 359, 367-68 (3d Cir. 2005); see also Pembaur v. City of

Cincinnati, 475 U.S. 469, 480 (1986) ("[I]t is plain that municipal liability may be imposed for a

single decision by municipal policymakers under appropriate circumstances.").  However,

Eldridge does not even argue that Norristown has a policy of discriminatory conduct, retaliation,

or depriving its employees of procedural due process, much less brief the issue of whether

---

[10]Eldridge also appears to argue that Detective Emrich engaged in discriminatory conduct when
she alleges that she and Devon Vann, another African-American Norristown employee, were
"targeted" during the Pacelli Investigation.  Pl.'s Resp. 21.  However, such allegations fail to
satisfy Eldridge's burden at summary judgment.  The record is clear that Emrich had legitimate,
non-discriminatory reasons for discussing the matter with both of them; that he did not consider
Eldridge a suspect; and that he did not require Eldridge or Vann to issue a written statement on
the matter.  Def.'s Mot. Summ. J. P-6; Emrich Dep. 21:10-14, 26:16-27:10, 27:16-28:4, 28:19-
22, 43:24-44:2, 44:3-13.  Additionally, Emrich made the decision to speak to Vann and Eldridge
entirely on his own, without the approval of any Norristown policymaker.  Emrich Dep. 32:1-14.
Eldridge fails to address either of these issues in arguing that Emrich's conduct was partial
evidence of a pattern of discriminatory conduct by Norristown.

Forrest is a policymaker for purposes of § 1983.  See Andrews, 895 F.2d at 1480 (noting that in proving municipal liability under § 1983, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom").

Therefore, although Eldridge asserts federal statutory and constitutional violations (i.e., disparate treatment, retaliation, and deprivation of procedural due process), she fails to detail a policy or custom that has affected her, to identify a policymaker that has shown deliberate indifference or acquiescence to these alleged violations, or to demonstrate any sort of causation. Her failure to adequately address these issues warrants a grant of Norristown's motion for summary judgment as to all of Eldridge's § 1983 claims.

## IV. CONCLUSION

For the foregoing reasons, I will deny Norristown's motion for summary judgment on Eldridge's Title VII and PHRA disparate treatment claims.

I will grant Norristown's motion for summary judgment on Eldridge's Title VII and PHRA retaliation claims.  I will also grant Norristown's motion for summary judgment as to Eldridge's disparate treatment, retaliation, and procedural due process claims under 42 U.S.C. §§ 1981 and 1983.

**s/Anita B. Brody**

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

30